## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEWPAGE CORPORATION., *et al.*, | ) | Case No. 11-12804 (KG) |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | |
| | ) | |
| PIRINATE CONSULTING GROUP, | ) | |
| LLC, AS LITIGATION TRUSTEE OF | ) | |
| THE NP CREDITOR LITIGATION | ) | |
| TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 13-52435 (KG) |
| | ) | |
| ERCO WORLDWIDE, A DIVISION OF | ) | |
| SUPERIOR PLUS LP, | ) | |
| | ) | |
| Defendant. | ) | **Re: Adv. D.I. Nos. 36, 44** |

## OPINION

## INTRODUCTION

The Court is issuing its opinion in this preference adversary proceeding. On September 7, 2011 (the "Petition Date"), NewPage Corporation[1] ("NewPage") and its affiliates (together with NewPage, the "Debtors") filed petitions for relief under Chapter

---

[1] NewPage Group Inc. owned 100% of NewPage Holding Corporation's common stock, which in turn owned 100% of the common stock of NewPage Corporation. *Complaint to (A) Avoid Transfers Pursuant to Bankruptcy Code Sections 547 and 502, and (B) Recover Property Transferred Pursuant to Bankruptcy Code Section 550* ¶¶ 14–15; Adv. D.I. 1. "NewPage Corporation was the Company's primary operating subsidiary and indirectly owned the other Debtors and various other affiliated non-debtor entities." *Id.* ¶ 15.

11 of the United States Bankruptcy Code. D.I. 1.[2] On December 14, 2012, the Court entered

an order (the "Confirmation Order") confirming the Debtors' plan of reorganization (the

"Plan"). D.I. 2945. On December 21, 2012, the Effective Date, as defined in the Plan,

occurred. *Id.* ¶ 1.2.55. On October 29, 2013, PIRINATE Consulting Group, LLC, the

Litigation Trustee of the NP Creditor Litigation Trust (the "Trustee"), as created by the

Plan (*id.* ¶¶ 1.2.94–102), filed a three-count complaint (the "Complaint") against ERCO

Worldwide ("ERCO"), a Division of Superior Plus LP, alleging that payments (the

"Transfers") totaling not less than $9,907,449.33 are recoverable pursuant to 11 U.S.C. §§

547 and 550 (¶¶ 1, 29–42 & n.2; Adv. D.I. 1) and requesting that all of ERCO's claims

against the Debtors be disallowed pursuant to 11 U.S.C. § 502. *See id.* ¶¶ 43–48.

Pending before the Court is ERCO's motion for partial summary judgment (the

"Motion") pursuant to Federal Rule of Civil Procedure 56, made applicable to this

adversary proceeding by Federal Rule of Bankruptcy Procedure 7056. Adv. D.I. 36. ERCO

principally argues that the bulk of the alleged Transfers were on account of pre-existing,

ongoing contracts between the parties, rendering them unavoidable as a matter of law.

*Id.* ¶ 7 (referencing *In re Kiwi International Air Lines, Inc.*, 344 F.3d 311 (3d Cir. 2003) and

*PIRINATE Consulting Grp., LLC v. Avoca Bement Corp. (In re NewPage Corp.)*, 517 B.R. 508

---

[2] References to "D.I." refer to the main proceeding's docket, references to "Adv. D.I." refer to this proceeding's docket, and references to "App. Ex." refer to the *Appendix to Opening Brief in Support of Motion of Defendant ERCO Worldwide, A division of Superior Plus LP, for Partial Summary Judgment*. Adv. D.I. 41.

(Bankr. D. Del. 2014)).[3] In response, the Litigation Trustee filed a cross motion for summary judgment (the "Cross-Motion"), challenging the validity of the alleged contracts. Adv. D.I. 44. The issue presented by the Motion and the Cross-Motion is whether two contracts—the Sodium Chlorate Contract (the "Chlorate Contract") and the Caustic Soda Contract (the "Soda Contract") (collectively, the "Contracts")—expired or terminated prior to the Effective Date. For the reasons stated herein, the Court finds that the Chlorate Contract did expire or terminate prior to the Effective Date and grants partial summary judgment in the Trustee's favor. The Court also finds that the Soda Contract did not expire or terminate prior to the Effective Date and grants partial summary judgment in ERCO's favor.

**FACTS**

A. The Parties

Pre-bankruptcy, the Debtors and their non-debtor subsidiaries and affiliates comprised the largest coated paper manufacturer in North America. Declaration of George F. Martin, dated September 7, 2011 ("Martin Decl.") ¶ 4; D.I. 3.[4] The Debtors operated sixteen paper mills located in Kentucky, Maine, Maryland, Michigan, Minnesota and Wisconsin. *Id.* ¶¶ 6–7. Producing paper at such a level required the Debtors to maintain supplies of "three crucial inputs: (a) pulp (wood reduced to its paper-

---

[3] ERCO alleges that $8,404,634.00 and $1,442,835.51 of the Transfers were on account of the Chlorate Contract and the Soda Contract (as defined below), including their amendments, respectively. Christie Decl. ¶ 25. ERCO concedes that $59,979.82 is a valid preference. *Id.*

[4] Unlike regular writing or typing paper, coated paper is typically used in magazines and the like. Martin Decl. ¶ 6.

making form), (b) water, and (c) chemicals." *Id*. ¶ 8. Common chemicals included "latex and starch, which are used to affix coatings to paper; calcium carbonate, which brightens paper; titanium dioxide, which makes paper opaque; and other chemicals to bleach or color paper or purify the [Debtor]'s water supply." *Id*. ¶ 10. The Debtors purchased chemicals from a "variety of suppliers." *Id*. NewPage, as a Debtor affiliate, purchased — and continues to purchase — chemical supplies from ERCO. *See generally* Declaration of John F. Christie, dated May 24, 2016 ("Christie Decl."); Adv. D.I. 39. ERCO produces and supplies inorganic products and technology for the production of chlorine dioxide. *Id*. ¶ 3. Additionally, "ERCO is the second largest producer of sodium chlorate in the world and supplies to, among other customers, the pulp and paper industry." *Id*. Like other manufacturers in the chlorate and chlor-alkali industries, ERCO operates their plants "at or near 100% practical capacity" with a "finite amount of supply" that is committed to customers through contract. *Id*.

## B. The Contracts

The Court merely introduces the Contracts below and reserves analysis for the discussion.

### 1. The Chlorate Contract

In January 2006, ERCO and NewPage executed the Chlorate Contract. *See* App. Ex. at A0009–16. The Chlorate Contract, governed by Ohio law, was a standard requirements contract, wherein ERCO agreed to sell NewPage its entire need for Sodium Chlorate Crystal for two mills. *Id*. at A0015–16. The Chlorate Contract also provided that "[t]his Agreement can be modified or amended only by a writing duly executed by the seller

and the buyer" (the "No Oral-Modification Clause"). *Id*. at A0014. The initial "Term and Termination" section lasted until the earlier of December 31, 2006, or a written termination to the other party for breaches, defaults or other related issues. However, beginning in 2009, the parties amended the Chlorate Contract five times. *Id*. at A0012; Christie Decl. ¶ 4. Importantly, only two of the five amendments addressed the Chlorate Contract's Term and Termination section. *See* App. Ex. at A0017, A0021.

> 2. The Soda Contract

In April 2008, NewPage and ERCO negotiated the alleged Soda Contract. *See* Motion ¶¶ 25–29; Cross-Motion ¶¶ 11–15. The Soda Contract was amended several times before the parties executed a "new" Chloralkali Supply Proposal in 2013 (the "2013 Soda Contract"). *See* Corrected Declaration of John F. Christie, dated July 22, 2016 ("Amend. Christie Decl.") ¶ 5; Adv. D.I. 50.[5]

C. The Treatment of Executory Contracts Under the Plan

Determining the Contracts' dates of expiration or termination is of critical importance given the Plan's treatment of executory contracts. Section 8.1 of the Plan, concerning "Assumption and Rejection of Executory Contracts," provides that:

> Each Executory Contract that has not expired by its own terms on or prior to the Confirmation Date, [i.e., December 14, 2012,] and which has not been assumed, assumed and assigned, assumed as modified, or rejected with the approval of the Bankruptcy Court, or which is not the subject of a motion to assume, assume and assign, assumed as modified, or reject as of the

---

[5] There was a dispute as to whether the 2013 Soda Contract was a "new" contract or an "amendment to" the Soda Contract. *See* Christie Decl. ¶ 15; Cross-Motion ¶¶ 79–80. ERCO's amended declaration clarified that it was, in-fact, a "new" contract. *See* Amend. Christie Decl. ¶ 5.

Confirmation Date, shall be [dealt with in accordance with the terms of this Section].

More specifically:

> Schedule 8.1(A) set forth contracts to be rejected, Schedule 8.1(B) set forth the contracts to be assumed, Schedule 8.1(C) set forth the contracts to be assumed as modified, Schedule 8.1(D) set forth the contracts to be assumed and assigned, and Schedule 8.1(E) set forth the contracts related to the SEO Settlement Agreement (as defined in the Plan).

Motion ¶ 38 (paraphrasing the Plan). Executory contracts not addressed in Schedules 8.1(A)–(E) are "deemed assumed by the Debtors and this Plan shall constitute a motion to assume that Executory Contract" (the "Catchall Provision"). Plan ¶ 8.1(f). The Confirmation Order (¶ 16) reinforced the Plan, finding:

> Any executory contract or unexpired lease of personal property of the Debtors that is not set forth in Schedules 8.1(A)–(E) is hereby deemed to have been assumed by the Debtors, except as otherwise provided in Schedule 8.1 of the Plan Supplement. Each executory contract or unexpired lease assumed hereunder shall include any modification, amendments, supplements, or restatements to such contract or lease. Entry of this Confirmation Order constitutes approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code. . . .

Although the Debtors maintained the right to adjust Schedules 8.1(A)–(E) until the Effective Date (Plan ¶ 8.1), Schedule 8.1 does not reference ERCO,[6] nor were the Contracts the subject of a motion to assume or reject between the petition Date and the Effective Date. *See Plan Supplement to the Debtors' Fourth Amended Joint Chapter 11 Plan* (listing "Certain Executory Contracts Assumed and Rejected under the Plan," and failing to

---

[6] The Debtors, in support of their bankruptcy petitions, listed an executory contract with ERCO for "raw materials" on their Schedule G (Executory Contracts and Unexpired Leases) of assets and liabilities. D.I. 672; D.I. 1894.

mention ERCO) (D.I. 2828); *Amended Plan Supplement to the Debtors' Modified Fourth Amended Joint Chapter 11 Plan* (same) (D.I. 2909); *Second Amended Plan Supplement to the Debtors' Modified Fourth Amended Joint Chapter 11 Plan* (same) (D.I. 3005)); Motion ¶ 36. As such, a finding that the Contracts were still in effect as of the Effective Date would render them susceptible to the Catchall Provision. *See In re NewPage Corp.*, 517 B.R. at 517 (Bankr. D. Del. 2014) (finding a coal agreement that was not addressed in the Debtors' schedules to be executory and assumed under the Catchall Provision in the same Plan at issue).

## JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2)(F). Venue is proper pursuant to 28 U.S.C. § 1409.

## STANDARD OF REVIEW

A bankruptcy court must grant summary judgment where "there is no genuine issue as to any material fact and that [each of] the moving part[ies] is entitled to a judgment as a matter of law." *Kiwi*, 344 F.3d at 316 (quoting Fed. R. Civ. P. 56(c)). In evaluating the evidence, the court must view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion. *Id.* (citation omitted). If the moving party meets the burden, the non-moving party then bears the burden of proving that a material fact exists that makes summary judgment inappropriate. *IT Litig. Trust v. Alpha Analytical Labs* (*In re IT Group, Inc.*), 331 B.R. 597, 600 (Bankr. D. Del. 2005). Summary judgment standards are unaffected by the filing of cross-

motions, as the Court "must consider each motion independently." *In re U.S. Wireless Corp., Inc.*, 386 B.R. 556, 560 (Bankr. D. Del. 2008).

## DISCUSSION

### Count I: To Avoid Preferential Transfers Pursuant to 11 U.S.C. § 547[7]

In order for the Trustee to avoid an allegedly preferential transfer pursuant to Section 547, it must satisfy the elements set forth in the statute itself:

> Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> > (A) on or within 90 days before the date of the filing of the petition; or
> > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
> > (A) the case were a case under chapter 7 of this title;
> > (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Third Circuit has held that "section 547(b)(5) cannot be satisfied where an executory contract is assumed under section 365[.]" Motion ¶ 49 (citing *Kiwi*, 344 F.3d at 314).[8] More

---

[7] ERCO reserves their rights with respect to additional defenses under Section 547. Motion at p. 20, n.12.

[8]

> The Bankruptcy Code does not define 'executory contract,' but the accepted definition is that of Professor Countryman. 'An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance

specifically, "'[s]ince the contract creditor whose contract is assumed would be paid in full pursuant to [section] 365, a trustee seeking to avoid as preferential pre-petition transfers made pursuant to the contract' cannot satisfy section 547(b)(5)." *Id.* (citing *In re NewPage Corp.*, 517 B.R. at 514). Relying on such precedent, ERCO argues that the Trustee cannot meet his burden under Section 547(b)(5). *Id.* ¶¶ 49–50. The Trustee maintains that "there simply were no executory contracts to be assumed pursuant to the Plan on the Effective Date." Cross-Motion ¶ 10.

A. The Chlorate Contract

The Court begins its discussion with the focal point of the Transfers, the Chlorate Contract. The parties amended the agreement several times and dispute the legal effect of such amendments. Although the amendments reference a variety of the Chlorate Contract's provisions, the Court highlights only those it deems important for deciding the issue.

1. The Amendments

a. The First Amendment ("Amend. No. 1")

Dated April 2009, Amend. No. 1 extended the "Term and Termination" section from December 31, 2006 to December 31, 2011. App. Ex. A0017. Amend. No. 1 also

---

would constitute a material breach excusing the performance of the other.' *In re Columbia Gas Sys. Inc.*, 50 F. 3d 233, 239 (3d Cir. 1995) (citing *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F. 2d 36, 39 (3d Cir. 1989)) . . . The time for determining if a contract is executory is when the bankruptcy petition is filed. *Columbia Gas*, 50 F. 3d at 240 (citations omitted).

*In re HQ Global Holdings, Inc.*, 290 B.R. 507, 509–10 (Bankr. D. Del. 2003).

9

provided that "Except as specifically augmented and modified herein, the Agreement is unchanged and remains in full force and effect." *Id*. at A0019.

   b. The Second Amendment ("Amend. No. 2")

Dated September 2009, Amend. No. 2 changed the Term and Termination section as follows:

> [1](a) This Agreement has been in effect as and from January 1, 2006 and will continue in full force until the earlier of
>
>> (i) December 31, 2011 unless extended pursuant to section 1(b) or
>> (ii) any earlier termination pursuant to section 2; (the "Term")
>
> [1](b) The parties acknowledge and agree that [ERCO] shall have the option to extend this Agreement for one period of six (6) months on the same terms and conditions contained in this agreement, in which case this Agreement shall terminate on June 30, 2012. The option to extend as set forth in this paragraph shall be deemed exercised by [ERCO] unless [ERCO] notifies [NewPage] in writing . . . .
>
> The Parties agree to meet in the second quarter of 2011 to discuss options for an extension of this Agreement effective January 1, 2012 based on the market at that time.

App. Ex. A0021. ERCO never notified NewPage in writing of its intention to terminate the Chlorate Contract; thus, it was automatically extended through the agreed upon June 30, 2012. Motion ¶ 18 (citing Christie Decl. ¶ 11). Amend No. 2 also modified the "Price and Payment Terms" section, noting ERCO would—for the first time—"provide a Temporary Voluntary Allowance" (the "TVA"). *Id*. at A0020. The TVA reduced the Base Price, as defined in the same amendment, resulting in a "lower net purchase price."

Cross-Motion ¶ 22.[9] Importantly, separate from other terms in the Chlorate Contract, the TVA maintained its own termination date. App. Ex. at A0021 ("The TVA will remain in place for six (6) months and expire on December 31, 2009. Failure to meet the payment terms in this Agreement will result in the TVA being removed until such a time as agreed payment terms are met.").

### c. The Third Amendment ("Amend. No. 3")

Dated January 2010, Amend. No. 3 solely addressed the Price and Payment Terms section. *See id*. at A0023–24. Amend. No. 3 replaced the recently expired TVA under Amend. No. 2. *Id*. at A0023; Cross-Motion ¶ 24. Amend. No. 3 did not amend the Term and Termination section of the Chlorate Contract. App. Ex. at A0024 ("Except as specifically augmented and modified herein, the Agreement is unchanged and remains in full force and effect."); *see* Cross-Motion ¶ 25. Rather, Amend. No. 3 explicitly provided that the "Parties agree that the above Price and Payment Terms apply for calendar year 2010 only. The Price and Payment Terms of Amendment No. 2 dated September 15, 2009 shall be [sic] return to full force and effect after December 31, 2010." App. Ex. at A0024.

### d. The Fourth Amendment ("Amend. No. 4")

Dated January 2011, Amend. No. 4 modified the Price and Payment Terms and instituted a new TVA. App. Ex. at A0025–26. Amend. No. 4 also provided that if the parties agreed to a long term contract before June 30, 2011, the pricing structure outlined

---

[9] The price reduction fluctuated "depending on which of the Debtors' mills, or manufacturing sites, was the ultimate destination of the purchased Sodium Chlorate." Cross-Motion ¶ 5, n.5.

therein would remain in place through December 31, 2011. *Id.* at A0026. Failure to execute a long term contract would render the TVA void as of July 1, 2011 "and the Base Price w[ould] be subject to semi-annual increases beginning July 1, 2011 as outlined in Article 7 below." *Id.*[10] Because the parties failed to execute a long term contract before July 1, 2011 (*see* Christie Decl. ¶ 7; Cross-Motion ¶ 30), the Base Price would be "subject to semi-annual increases in January and July of each year" beginning January 1, 2011. App. Ex. at A0026. Importantly, "[l]ike Amend. No. 3, Amend[.] No. 4 did not modify the [Chlorate Contract's] Term and Termination section." Cross-Motion ¶ 29.

e. The Fifth Amendment ("Amend. No. 5")

Dated July 2011, Amend. No. 5 modified the Price and Payment Terms and the TVA, which remained tied to NewPage's purchase volume. App. Ex. at A0028–30. The price mechanism therein would expire on January 1, 2012; thereafter, the TVA would be removed and, like Amend. No. 4's terms, the Base Price would be subject to semi-annual increases in January and July of each year. *Id.* at A0029. Amend. No. 5 did not provide an end date for the semi-annual price increases (Motion ¶ 21) and, like Amend. Nos. 3 and

---

[10] In full, Article 7, found in Amend. Nos. 4 and No. 5, provided:

> The Base Price will be subject to semi-annual increases in January and July of each year. The semi-annual periods are (i) January through June; and (ii) July through December. Within ten (10) days of the close of each semi-annual period, Seller shall provide written notice to Buyer of any price increases. Notwithstanding the foregoing, each semi-annual price increase shall not increase by an amount greater than six percent (6%) and is exclusive [sic] any other charges for which Buyer may be responsible.

App. Ex. at A0026, A0029.

No. 4, it "did not modify the Term and Termination section of the Chlorate Contract." Cross-Motion ¶ 33.[11]

### 2. The Amendments and Contractual Ambiguity

The Trustee claims that the Chlorate Contract and its amendments are unambiguous, as the Term and Termination section "clearly expired prior to the Confirmation Date." Cross-Motion at p. 14. ERCO argues that the Trustee's reading is contrary to the mandates under Ohio law and "is based on an isolated reading of one provision of Amend. No. 2 and if accepted, would render provisions in subsequent amendments meaningless." *Reply Brief in Support of Motion of Defendant ERCO Worldwide, a Division of Superior Plus LP, for Partial Summary Judgment and Answering Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment in Favor of Plaintiff* ("Reply") ¶ 4; Adv. D.I. 48. ERCO highlights several provisions in Amend. No. 5 that purport to show that the parties intended to continue transacting business. *See id*. ¶¶ 6–8 (detailing that "'the TVA will be removed . . . and the Base Price will be subject to semi-annual *increases*[,]' . . . . the 'Base Price will be subject to semi-annual increases *in January and July of each year*[,]'" and the fact that "[t]he letter of credit issued by NewPage in ERCO's favor did not expire until July 31, 2012," a month after the "purported termination date"). These competing interpretations require the Court to consider whether an ambiguity exists.

---

[11] ERCO asserts that "the parties further agreed to extend the TVA until June 30, 2012." Motion ¶ 21 (citing Christie Decl. ¶ 8). This contention is unsupported by the record, as the Christie Declaration merely references an ERCO email stating that, pursuant to the reporting duties under Article 7, prices would soon increase. ¶ 8 (citing App. Ex. at A0066); *see also* Cross-Motion ¶¶ 32–33 (making no reference to the alleged TVA extension).

Under Ohio law, contractual ambiguity is a matter of law. Cross-Motion ¶ 50 (citing *Eclipse Res.-Ohio, LLC v. Madzia*, 2016 WL 814958, at *6 (S.D. Ohio Mar. 2, 2016)). Further,

> Contractual language is ambiguous 'only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations.'. . . '[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract.' . . . If the language in the contract is ambiguous, the court should generally construe it against the drafter.

*Eclipse*, 2016 WL 814958, at *6–7; *see also Dayton Outpatient Ctr., Inc. v. OMRI of Pensacola, Inc.*, 19 N.E.3d 608, 613 (Ohio Ct. App. 2014) ("A stumbling block in the search for intended meaning is ambiguity."). "Courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*, 2017 WL 6540576, at *3 (Ohio Ct. App. Dec., 21, 2017). Courts must, therefore, read a written contract "as a whole, and the intent of each part will be gathered from a consideration of the whole." Reply ¶ 4 (citing *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 797 (6th Cir. 2003)). Courts must give effect to and "harmonize all provisions of the contract, and should not dismiss any provision as inconsistent if there exists a reasonable interpretation that gives effect to both." *Id.* (citing *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp. 2d 278, 884 (S.D. Ohio 2013). Interpretations that yield "meaningless or superfluous" provisions should be "avoided." *Thom v. Perkins Twp.*, 2012 WL 1154578, at *4 (Ohio Ct. App. Apr. 6, 2012).

Having analyzed the Chlorate Contract and its amendments, the Court does not find ambiguity. Although the interpretations advanced by the parties are somewhat

circular in that each could *potentially* render provisions superfluous—ERCO's

interpretation would render the Term and Termination section superfluous and the

Trustee's interpretation would render the words of future intent found in the Price and

Payment Terms section superfluous—the Court does not find ERCO's interpretation

persuasive. Rather, ERCO's interpretation of Amend. No. 5 (*see* Reply ¶¶ 6–8) is not

supported by the express terms of the contract (even construing the terms against the

drafter, NewPage, as evidenced by its name on the letterhead). App. Ex. at A0009. The

express terms clearly provide that the Term and Termination section were never

amended subsequent to Amend. No. 2. *See* Cross-Motion ¶ 52. As a result, the parties

were conducting business in the absence of a formal contract.[12] As evidenced by Amend.

Nos. 1 and No. 2, NewPage clearly knew how to extend the Term and Termination

section. Additionally, ERCO, a sophisticated party, received actual notice[13] in *every*

amendment that "Except as specifically augmented and modified herein, the Agreement

is unchanged and remains in full force and effect." App. Ex. at A0019, A0022, A0024,

A0027 and A0030. Finding no ambiguity, the Court need not consider the course of

conduct arguments raised by ERCO.[14] Further, finding that the Chlorate Contract was

---

[12] The Court does not take up the issue of what type of relationship existed between the parties beyond the Chlorate Contract's June 30, 2012, expiration, e.g., whether it was a "new" contract on the basis of the same terms, an implied in-fact contract or some other type. Such analysis is unnecessary given that any such contract would be a post-petition contract between NewPage and ERCO.

[13] *See* Actual Notice, Black's Law Dictionary (10th ed. 2014) ("Notice given directly to, or received personally by, a party.").

[14] The Court does, however, wish to briefly address the no-oral modification provision under Ohio law and why, it, too, weighs in favor of NewPage. In *Fields Excavating, Inc. v. McWane, Inc.*, the court thoroughly reviewed a challenge to a no-oral modification clause, finding that although

not in existence as of the Effective Date means the "right to assume it [wa]s extinguished." *Ctys. Contracting & Const. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1061 (3d Cir. 1988); *see id.* ("A contract may not be assumed under § 365 if it has already expired according to its terms.").

B. The Soda Contract

The Court now considers the remaining Transfers and the validity of the Soda Contract. The root document that ERCO argues serves as the Soda Contract is an unsigned offer letter, dated April 2008. *See* App. Ex. at A0038–39. Such a document reveals statute of frauds concerns. Ordinarily, the Court would begin by considering exceptions to the doctrine and determine to what extent those exceptions have or have not been satisfied. Here, however, the Court must first consider a choice of law issue, as

---

it was unenforceable in the instant matter, and generally against Ohio public policy, that such clauses are not *per se* unenforceable. 2009 WL 3721013, at *3–7 (Ohio Ct. App. Nov. 9, 2009). Nonetheless, ERCO harps on the following language employed by the court: "If strictly enforced, a no-oral-modification clause would deny effect to every oral modification—even those that are fully voluntary, freely entered, and entirely consensual—simply because there was no writing." The Court does not disagree with this sentiment, but it must be read, as the Trustee urges, in the context of any "anti-waiver" provisions also present in an agreement. *See* Tr. Trans. pp. 46–47, 14–4; *see also Fields*, 2009 WL 3721013, at *4–7 (considering the specific language used in several anti-waiver provisions). As the *Fields* court noted, "Ohio courts have consistently upheld anti-waiver clauses[.] . . . *In those cases the anti-waiver clauses were enforced pursuant to their terms*. We find no fault with the enforcement of anti-waiver clauses. However, *an anti-waiver clause must be enforced pursuant to its explicit terms*." *Id.* at *7 (emphasis added). The no-oral modification clause in *Field* was not broadly drafted, as it applied to specific acts which were not before the court. *See id.* NewPage's anti-waiver provision was, however, broadly drafted and would encompass a range of issues, including those asserted by ERCO. *Compare* App. Ex. at A0014 ("Waiver: The failure of either party to enforce any provision of this Agreement shall not constitute a waiver of such provision. The waiver by either party of any failure of the other party to perform any obligation under this Agreement shall not constitute a continuing waiver or a waiver of any future failure to perform such obligation") *with Fields*, 2009 WL 3721013, at *2 ("WAIVER. No delay or failure by Seller to exercise any right or remedy under these Terms and Conditions shall be construed to be a waiver thereof. Waiver by Seller of any breach shall be limited to the specific breach so waived and shall not be construed as a waiver of any subsequent breach.").

the Soda Contract and its associated amendments do not reference the governing law of the Soda Contract. *Compare id.* at A0038–46, A0064–65 (lacking a governing law section) *with id.* at A0015 (containing a "Governing Law and Dispute Resolution" section in the Chlorate Contract).

"The Third Circuit instructs courts to first determine if there is an actual conflict between competing state laws before proceeding with a choice-of-law analysis." *In re Am. LaFrance, LLC*, 461 B.R. 267, 276 (Bankr. D. Del. 2011) (citing *Oil Shipping B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015, 1018 (3d Cir. 1993)). The Third Circuit has also noted that:

> One line of cases provides that a false conflict exists if there are no relevant differences between the laws of the two states, or the laws would produce the same result. If there is a false conflict under this definition, the court does not have to engage in a choice of law analysis, and may refer to the states' laws interchangeably.

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229 (3d Cir. 2007) (citations omitted). The parties have not alleged any choice of law conflict, and the Court is unaware of any conflict.[15] Nonetheless, for the parties' benefit, the Court indulges in a brief choice of law analysis.

It is well settled that federal courts apply the choice of law principles of the state in which they sit (*see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 243 n.8 (1981); *Allstate Ins.*

---

[15] Each of the states addressed herein maintain the same exceptions to the statute of frauds. *Compare* Wis. Stat. Ann. § 402.201 (West) *with* Del. Code Ann. tit. 6, § 2-201 (West) *and* Ohio Rev. Code Ann. § 1302.04 (West).

*Co. v. Hague,* 449 U.S. 302, 307 (1981)), and the Delaware Supreme Court has stated that, in determining whose law applies for interpreting a contract, a court must consider which state "has the most significant relationship to the transaction and the parties." *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 46–47 (Del. 1991); *Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.,* 394 A.2d 1160, 1166 (Del. 1978). Additional factors to consider include "the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties." *In re Am. LaFrance, LLC*, 461 B.R. at 272 (citing Restatement (Second) Conflict of Laws § 188).

ERCO assumes without citation that Ohio law governs the Soda Contract, but the Court prefers a more thoughtful analysis of the states' competing interests. *See* Reply ¶ 34. Here, the following states are viable: Ohio (NewPage's principal place of business, as well as the governing law for the Chlorate Contract), Delaware (NewPage's place of incorporation) and Wisconsin (the location of the mills discussed in the alleged contract, and the location of the personnel discussing it).[16] The Court finds that Wisconsin law governs the Soda Contract. It is the only forum in which there are purposeful contacts with the subject matter of the agreement (i.e., the mills), and it is the location of the parties discussing the Soda Contract's terms. *See* App. Ex. at A0038 (showing a Wisconsin address for NewPage); *id.* at A0041 (same); *id.* at A0043 (showing a Wisconsin address for

---

[16] Although ERCO is a Canadian entity, the Court does not have reason to believe that the parties—both of whom were transacting business domestically under the alleged contract—would have designated Canadian law to govern their relationship.

ERCO); *id.* at A0044–46 (sending caustic soda to all Wisconsin mills). Having determined that Wisconsin law governs the Soda Contract, the Court now considers what effect this has on the Soda Contract's formation.

The Trustee maintains that the Soda Contract was "unsigned, [and ERCO's] reliance is misguided, as it has not proven the existence of a valid contract." Cross-Motion ¶ 77. However, as argued by ERCO (albeit in the context of Ohio law), Wisconsin maintains exceptions to the statute of frauds that would render the unsigned offer letter a binding agreement between the parties. The Wisconsin statute provides:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by the party's authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.
>
> (2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of sub. (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

Wis. Stat. Ann. § 402.201 (West). Section 2 clearly provides that a merchant's failure to object to another merchant's confirmatory memo within ten (10) days renders the agreement effective.[17] The record reveals that the Soda Contract is dated April 18, 2008.

---

[17] Given the parties' stature in the chemical and paper industry, both are merchants under Wisconsin law. *See* Wis. Stat. Ann. § 402.104 (West) (providing that "'between merchants' means in any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants" and that "'merchant' means a person who deals in goods of the kind or otherwise

App. Ex. at A0038. The record does not indicate any objection by NewPage, and the parties rely on the same exhibits. *See* Cross-Motion ¶ 9, n.3. The exhibits do not include invoices from 2008, as it pre-dated the alleged preference period, but the Court finds that NewPage's silence regarding the Soda Contract and the subsequent amendments (described below) satisfies Wisconsin's exception to the statute of frauds. *See* App. Ex. at A0038 (providing at the top of the Soda Contract that "[t]his will confirm the *agreement* between NewPage and ERCO Worldwide for supply of sodium hydroxide (caustic soda)") (emphasis added).

In the alternative, the Trustee argues that, even if the Soda Contract is enforceable, which the Court has just found that it is, "it would have expired on June 30, 2012." Cross-Motion ¶ 78. The Trustee's argument is, however, misguided and stems from a misinterpretation of the parties' amendments. ERCO sent NewPage an email on September 16, 2009, which included a letter (dated July 29, 2009) recapping the Soda Contract's terms and certain amendments thereto. App. Ex. at A0041–42.[18] Of critical importance is the fact that this letter effectuated a change in the Soda Contract's "Period," providing "July 1, 2009 to June 30, 2012 (Initial Term), and *continuing from contract year to contract year thereafter unless written notice of termination is given by either party to the other*

---

by his or her occupation holds himself or herself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . .").

[18] The Trustee argues that the Soda Contract's amendments were "inconsistent with the parties' conduct under the Chlorate Contract, in which amendments were clearly marked." Cross-Motion ¶ 79. This is of no moment to the Court, as the Soda Contract does not specify a particular form of amendment. Further, it appears that NewPage, as evidenced by their letterhead (*see* App. Ex. at A0009), drafted the Chlorate Contract, while ERCO, as evidenced by their letterhead, drafted the Soda Contract. *Id*. at A0038.

*at least ninety (90) days prior to the end of any contract year.*" *Id.* at A0041 (emphasis added). Such language is indicative of an "evergreen contract," meaning "[a] contract that renews itself from one term to the next in the absence of contrary notice by one of the parties." Contract, Black's Law Dictionary (10th ed. 2014); *see* Reply ¶ 36. The subsequent Soda Contract amendment, dated July 2011, did not revise the "Period" of the agreement. *See* App. Ex. at A0043. Therefore, because "[i]t is undisputed that neither party gave the requisite notice of termination . . . the [] Soda Contract continued through both the Petition Date and the Confirmation Date." Motion ¶ 68 (citation omitted). Finding that the Soda Contract remains in effect also means that, pursuant to the Plan's language regarding executory contracts, the Soda Contract was assumed as of the Effective Date. *See* Plan § 8.1.[19]

Despite finding that the Soda Contract was an evergreen contract and assumed pursuant to the Plan, the Court must address an interesting wrinkle—the parties' execution of the 2013 Soda Contract. App. Ex. at A0064–65. Although the 2013 Soda Contract was executed in April 2013, the "Contract Term" was retroactive and provided "January 1, 2012 to December 31, 2013; evergreen contract with 90 day cancellation." *Id.* at A0064. The Trustee argues it defies logic that the parties would have "simultaneous contracts for caustic soda" (Tr. Trans. at p. 36, 11–16), and that it is more likely the case

---

[19] Such a finding is not inconsistent with this Court's recent decision in *In re Thane Int'l, Inc.*, No. 17-50476, 2018 WL 1027658 (Bankr. D. Del. Feb. 21, 2018), holding that implicit assumption cannot take place under the Bankruptcy Code. The facts of the instant case are markedly different than *Thane*, as there is no indication that the Debtor failed to abide by the formalities of Section 365, e.g., there are no allegations concerning a lack of notice or due process or uncured debts.

that the 2013 Soda Contract "did not replace [the Soda Contract], but rather was an entirely new contract." Cross-Motion ¶ 80.   ERCO filed an amended declaration to address this very issue. *See generally* Amend. Christie Decl. ERCO initially described the 2013 Soda Contract as an "amendment" to the Soda Contract; however, ERCO has since argued that this characterization "is not accurate," and the parties executed a "new" contract in April 2013. *Id.* ¶¶ 4–5. The Court finds that it is not beyond the bounds of reason for the parties to execute a new caustic soda contract, despite the Soda Contract still being in effect, because of several factors.

The Soda Contract and the 2013 Soda Contract are strikingly similar. *Compare* App. Ex. at A0038 (referencing the Wisconsin Rapids, Biron and Stevens Point mills) *with id.* at A0064 (same). While the contracts concern the same mills, the Court notes that the quantity of caustic soda to be purchased in the 2013 Soda Contract starkly increases the Wisconsin Rapids' requirements. *Compare* App. Ex. at A0041 (attributing 12,000,000 dry pounds to Wisconsin Rapids, i.e., 6,000 tons; 4,000,000 dry pounds to Biron, i.e., 2,000 tons; 400,00 dry pounds to Stevens Point, i.e., 200 tons; and 3,000,000 dry pounds to Whiting, i.e., 1,500 tons) *with id.* at A0064 (attributing 15,000 tons to Wisconsin Rapids, 4,000 tons to Biron and 400 tons to Stevens Point).[20] Similarly, the timing of the agreement must be considered. ERCO executed the 2013 Soda Contract on December 8, 2011, which is post-petition but pre-Effective Date, and NewPage executed it on April 1, 2013, a little over three months after the Effective Date. *See* App. Ex. at A0065. Given that the Debtors'

---

[20] "A ton is 2,000 pounds." App. Ex. at A0064.

bankruptcy was a Chapter 11, and not a liquidation, this has the effect of creating a new debtor entity—a reorganized debtor. *See In re Lacy*, 183 B.R. 890, 892 (Bankr. D. Colo. 1995) ("At confirmation, the 'debtor' becomes the 'reorganized debtor.' The reorganized debtor is a new legal entity."); 11 U.S.C. §§ 1327 and 1141. Thus, despite the similar subject matter of the Soda Contract and the 2013 Soda Contract, it was a "new" agreement between the reorganized debtor and ERCO. Confirmation and the transformative effect it has on a debtor does not "require" executory contract counterparties to execute new agreements, but it is plausible that parties do agree to do so for myriad reasons. Lastly, and perhaps most importantly, the 2013 Soda Contract makes no mention of the Soda Contract. *See* App. Ex. at A0064–65; Cross-Motion ¶ 79. This greatly supports ERCO's assertion that it was a new contract. Had the 2013 Soda Contract discussed, or even alluded to the Soda Contract, there would be room for doubt. Finding no such reference, the Court finds in favor of ERCO.

### Counts II and III: To Recover Property Pursuant to 11 U.S.C. § 550 and to Disallow All Claims Pursuant 11 U.S.C. § 502(d) and (j)

The Trustee also asks the Court to disallow ERCO's claims in the Debtors' bankruptcy case. The Trustee's request for disallowance depends upon Section 502(d), which provides for disallowance of claims if the claimant is liable for avoidance recoveries. ERCO's claims will be allowed except for the $59,979.82, which ERCO concedes is a valid preference, and the $8,404,634.00 under the Chlorate Contract.

## CONCLUSION

The Court will grant the following relief:

1.      The Court will grant the Cross-Motion in part, finding that, due to the expiration of the Chlorate Contract, and subject to ERCO's additional defenses under Section 547(c), ERCO is not entitled to a defense for the Transfers attributable to the Chlorate Contract, totaling $8,404,634.00. The Motion on the same issue is denied.

2.      The Court will grant the Motion in part, finding that ERCO is entitled to a defense for the Transfers attributable to the Soda Contract, totaling $1,442,835.51. The Cross-Motion on the same issue is denied.

3.      Based on ERCO's concession, the Trustee is awarded a preference in the sum of $59,979.82.


Dated: April 3, 2018

KEVIN GROSS, U.S.B.J.